IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CULTIVATR, INC.** | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| | : | NO. 24-4200 |
| **NORA PETERSON** | : | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

At the conclusion of this matter, the Court made detailed oral findings of fact regarding its credibility determination. The following written findings supplement those on-the-record statements and should be taken as collective findings of fact and conclusions of law.

I.  **Findings of Fact**

1. Sproutr is a consulting company which advises insurance companies in developing new products. JoAnne Artesani is the CEO of Sproutr. John Artesani, her husband, is the CFO of Sproutr.

2. JoAnne Artesani became familiar with Nora Peterson through a group called "Chief," which is designed to connect women business executives with each other.

3. On or about September 8, 2023, Nora Peterson, by way of her company "Halo," began consulting for Sproutr, which compensated Halo at the expense of $21,000 per month. (D-35).

4. On October 23, 2023, Cultivatr, Inc. was incorporated under Delaware law. John Artesani testified that no further bylaws were passed and that

1

the documents at D-11 were the only non-privileged documents which related to the formation of Cultivatr. (*See* doc request at D-54).

5. That means, by operation of Delaware law, that Cultivatr's stock possess all default rights under the Delaware General Corporate Law. *Colon v. Bumble, Inc.*, 305 A.3d 352, 359 (Del. Ch.), judgment entered, (Del. Ch. 2023) ("Because every charter incorporates the provisions of the DGCL, a share of stock possesses the default rights unless the charter expressly modifies them.").

6. Cultivatr is a holding corporation, whose current purpose is to hold a controlling interest in Sproutr. At the time of its incorporation, JoAnne Artesani was the sole, 100% owner of Cultivatr, which at the time was the sole, 100% owner of Sproutr.

7. At some point prior to October 25, 2023, Sproutr became aware of a potential deal with a company called Accelerant, and JoAnne Artesani determined she needed to expand Sproutr's capabilities and staff. As a result, JoAnne Artesani approached Nora Peterson to join Sproutr as a full-time employee.

8. JoAnne Artesani met with Nora Peterson on October 25, 2023, and made an offer for full time employment. (D-21, D-17). For the reasons placed on the record on October 21, 2025, this Court finds Nora Peterson's testimony throughout this case credible, and testimony of JoAnne and John Artesani not credible.

9. At the October 25th meeting, based upon weighing the credibility of the witnesses, this Court finds that JoAnne Artesani made an offer of, *inter alia*, a 5% ownership interest in Cultivatr which would vest immediately, and 2% phantom equity in Sproutr in exchange for Nora Peterson joining Sproutr.

10. As the Court noted previously, at the time of this meeting, JoAnne Artesani was the sole owner and top executive of both Cultivatr and Sproutr.

11. The terms offered by JoAnne Artesani at this meeting, therefore, constituted two legally-distinct offers to Nora Peterson: 1) an offer by Sproutr to work for it, and exchange to receive salary, benefits, and 2% Phantom Equity; and 2) an offer by Cultivatr of exchange for an immediately-vesting 5% ownership interest in Cultivatr in exchange for Nora Peterson agreeing to work for Sproutr, the only source of income to Cultivatr.

12. There was no discussion by the Parties to any specific privileges or responsibilities of equity ownership, no discussions about whether Nora Peterson would have to return the shares upon separation from Sproutr and Cultivatr, or anything beyond 5% ownership in Cultivatr in exchange for working for Sproutr.

13. JoAnne Artesani had authority to make this offer of 5% of Cultivatr as head of and sole owner of Cultivatr.

14. The evidence at trial clearly established that there is only one class of Cultivatr stock. This stock would possess all the default rights provided under the Delaware General Corporation Law, as neither Cultivatr's charter, nor any later corporate actions, has expressly overruled those rights to either expand or limit them.

15. The credible testimony of Nora Peterson, supported by the documentary evidence, shows that 5% equity in Cultivatr was offered to Nora Peterson by JoAnne Artesani as an incentive to join Sproutr as an employee.

   a. More specifically, Microsoft Teams messages between Nora Peterson and JoAnne Artesani implicitly show that equity in Cultivatr was discussed at this meeting. (D-21). Nora Peterson messaged JoAnne Artesani, saying "I just have a few quick questions on the holding corp. equity part." (*Id.*)

   b. JoAnne Artesani did not controvert, balk at, or express confusion at that comment. (*Id.*) It is clear she understood the equity to which Nora Peterson was referring.

    c. JoAnne Artesani, in response, referred Nora Peterson to John Artesani, showing further that equity in Cultivatr was part of JoAnne's offer to Nora Peterson. (*Id.*)

16. The next day, after being referred to John Artesani to address her questions regarding the Cultivatr equity, among other things, Nora Peterson accepted the full-time position with Sproutr. (D-21).

17. Plaintiff testified that the equity offer in Cultivatr was a key factor in her decision to close her independent consulting business "Halo" and join Sproutr.

18. Later that day, JoAnne Artesani delivered an Offer of Employment letter on behalf of Sproutr. (D-48). This letter does not make mention of equity granted by its parent company, Cultivatr.

    a. As will be explained, *infra*, this omission did not impact this Court's analysis, as the offer letter was from Sproutr, and naturally would not promise stock in its parent company.

19. On October 27, 2023, Nora Peterson and JoAnne Artesani signed an employment agreement between Nora Peterson and Sproutr. (D-12). This agreement reads primarily as a restrictive covenant. It makes no mention of benefits to be received by Nora Peterson, such as salary or medical insurnace.

20. The record is replete with proof of the agreement to provide Cultivatr equity to Nora Peterson.

21. Nora Peterson's conversations with CFO John Artesani, including a Microsoft Teams message thread beginning on October 27, 2023, provide further proof of an agreement to provide 5% Cultivatr equity to her. (D-6).

22. The first message in this thread is from John Artesani, which expressly acknowledges (at minimum) a discussion involving "5% in Cultivatr." (D-6). Much of the discussion afterwards regards how best to structure the grant of 5% in Cultivatr to Nora Peterson to minimize both side's tax burden.

23. At some point, Nora Peterson and Cultivatr began to renegotiate the oral agreement they reached, in an attempt to make it a more palatable tax event for both Cultivatr and Nora Peterson.

24. At various times, these discussions took at least three forms: (1) Cultivatr or Sproutr paying Nora Peterson a bonus to cover whatever tax burden she incurred from the grant; (2) Nora Peterson swapping stock in her own company Halo in exchange for the stock in Cultivatr; and (3) the creation of a new "Phantom Equity" plan which would provide Nora Peterson with her equity under a different structure.

25. Nora Peterson credibly testified that, although she understood she was entitled to a flat 5% equity stake in Cultivatr with no strings attached, she was willing to have these discussions: (1) to see if she could lower her own tax burden; and (2) because she agreed to work with Sproutr and the Artesanis, and she thought it was best to try and keep the peace if possible as her continued employment may have been at risk.

26. These renegotiation discussions took place over the course of several months.

27. The Parties at trial agreed that no further enforceable agreement was made as a result of this attempt to renegotiate.

28. The ongoing Microsoft Teams negotiations between Nora Peterson and John Artesani further endorse her right to 5% equity in Cultivatr.

    a. On March 11, 2024, at 12:02 P.M., Nora Peterson messaged John Artesani and made reference to "my [C]ultivatr specific equity[.]" (D-6).

    b. On March 18, 2024 at 10:05 A.M., John Artesani concedes that the "original discussions" were that Nora Peterson would receive 5% of Cultivatr, and that one of these tax-favorable alternatives was being recalculated "to make sure you got back to the original." (D-6).

    c. On March 20, 2024, at 1:15 P.M., Nora Peterson messaged John Artesani after reviewing a proposed phantom equity plan alternative

5

>  to their oral agreement and noted that it "seems to be a big departure from our initial agreement . . . ." (D-6).

29. John Artesani did not controvert, balk at, or express confusion at any of Nora Peterson's references to a previous agreement to grant her equity in Cultivatr.

30. John Artesani is a CFO with almost 30 years of financial management and business operation experience.

31. On March 20, 2023, at 1:20 P.M., John Artesani explained that Nora Peterson's 5% stake in Cultivatr was valued at $963,000.

32. This testimony was the subject of disagreement between the Parties as to whether that $963,000 figure represented the entire value of Cultivatr, or just Nora Peterson's 5% share. This Court has concluded beyond any doubt that this number was intended to express the value of 5% of Cultivatr.

33. Accelerant was granted a 15% ownership share in Sproutr in exchange for a $3.4 million investment.

34. $3.4 million for 15% of Sproutr creates an implied "post-money" value of Sproutr at $22,666,666. When you back out the $3.4 million investment, it creates an implied "pre-money" value of $19,266,666. 5% of that pre-money valuation is $963,333. That calculation simply cannot be coincidental.

35. For that reason, this Court concludes that approximately $963,000 is a contemporaneous valuation of 5% of Cultivatr, prepared by management in the ordinary course of business, with no litigation hindsight bias. This Court finds this to be a reasonably reliable calculation.

36. It is further not disputed that Nora Peterson never received the 5% equity in Cultivatr which was orally promised by JoAnne Artesani on behalf of Cultivatr as an incentive for Nora Peterson to join Sproutr.

37. In June 2023, Defendants terminated Nora Peterson's employment with Sproutr.

II. **Conclusions of Law**
   a. **Breach of Contract and Promissory Estoppel Legal Standards**

   38. Nora Peterson asserted claims for breach of contract and promissory estoppel in this case, along with a request for declaratory judgment, all based upon the oral agreement between the parties.

   39. Oral agreements are enforceable under Pennsylvania law. *See, e.g.*, *Baldassarre v. Singer*, 282 A.2d 262, 265 (Pa. 1971) (affirming decision which found an enforceable oral agreement to award stock to two key employees who agreed to join the company in exchange for, *inter alia*, ten percent of the stock).

   40. In order to be enforceable, a contract need only include the essential terms of the bargain. *Field v. Golden Triangle Broad., Inc.,* 305 A.2d 689, 694 (Pa. 1973) (finding enforceable contract despite appellant's argument that material terms and customary conditions typically found in such a contract were missing, and holding "the fact that additional provisions would enhance the position of both parties is not controlling.").

   41. A claim for breach of contract under Pennsylvania law requires: (1) the existence of a contract between the plaintiff and defendant, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) damage resulting from a breach of that duty. *CoreStates Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999).

   42. A claim for promissory estoppel requires "(1) the promisor made a promise that [it] should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Industries,* 745 A.2d 606, 611 (Pa. 2000).

   b. **Offer and Acceptance; Performance; Breach.**

   43. This Court will first address the formation of the oral contract between Nora Peterson and Cultivatr, and will subsequently address its breach.

44. This Court finds, as explained in detail on the record at the conclusion of the bench trial, that Nora Peterson testified credibly and that the Artesanis were not credible.

45. Based on that, along with the significant corroborating documentary evidence presented at trial, this Court has found that JoAnne Artesani orally offered Nora Peterson 5% ownership in Cultivatr in exchange for Nora Peterson's agreeing to work for Sproutr, and that Nora Peterson accepted the verbal offer by way of her Microsoft Teams message on October 26, 2023, at 12:16 P.M. (D-21).

46. This Court finds, and the Parties do not dispute, that Nora Peterson performed her obligation under the contract by, in fact, joining Sproutr as an employee.

47. Further, there is no dispute that Cultivatr did not deliver ownership interest to Nora Peterson. This Court finds that this failure constituted a breach of Cultivatr's obligation to Nora Peterson.

   c. **Consideration**

48. There can be no doubt that the 5% equity in Cultivatr promised to Nora Peterson constitutes consideration to her sufficient to support the formation of a contract.

49. Defendants argued, however, that there was no consideration received by Cultivatr in exchange for that equity granted to Nora Peterson. This argument fails.

50. As mentioned numerous times at trial, JoAnne Artesani served as sole owner and head executive of Cultivatr at the time she met with Nora Peterson.

51. When JoAnne Artesani offered Nora Peterson 5% equity in Cultivatr and 2% phantom equity in Sproutr, she did so in her capacity as head of Cultivatr and head of Sproutr, respectively.

52. In so doing, this Court finds that JoAnne Artesani created two separate obligations: an oral contract on behalf of Cultivatr, and an oral contract on behalf of Sproutr.

53. In exchange for 5% of its stock, Cultivatr received a commitment from an experienced executive to help grow Sproutr, the only asset which Cultivatr owned and Cultivatr's only source of income.

54. The fact that Nora Peterson's actual employment was with Sproutr does not mean that Cultivatr did not receive something of value. Cultivatr received a significant infusion of experience in the team running its asset, which it presumably believed would lead to more profits passed from Sproutr onto Cultivatr, a clear benefit to Cultivatr.

55. In this way, this contract is like any number of contracts with third party beneficiaries, which are routinely understood as enforceable.

56. Therefore, there was consideration provided by Nora Peterson to Cultivatr in exchange for the 5% interest.

   d. **Liability Against Sproutr or Cultivatr**

57. Nora Peterson's counterclaims were brought against both Cultivatr and Sproutr. As this Court finds that Cultivatr breached its obligations under its oral agreement with Nora Peterson and that Nora Peterson was harmed by that breach, this Court has found liability against Cultivatr.

58. Sproutr, however, had no legal ability to promise its parent's stock. Sproutr is not a party to the oral contract between Cultivatr and Nora Peterson. For that reason, Sproutr is not liable for Cultivatr's promise, and Sproutr there is no finding of liability against Sproutr.

   e. **Definitive Terms and Attempts to Renegotiate**

59. Throughout this case, Cultivatr and Sproutr have repeatedly suggested that a number of essential terms were missing from the oral contract formed by Nora Peterson and JoAnne Artesani.

60. This Court disagrees with that assessment as a matter of law.

61. More specifically, this Court finds the only essential terms of the oral contract were that Nora Peterson would work for Sproutr, and that Cultivatr would provide her 5% ownership interest.

62. As mentioned previously, Delaware law, which governs Cultivatr's corporate existence and the rights and responsibilities of its shareholders, creates a set of default rules which apply where, as here, a corporation does not elect to make any changes to upset those defaults.

63. It is not disputed that Cultivatr's initial corporate filings were sparse and did not include any charter or bylaw provisions which would upset the defaults of Delaware law.

64. Therefore, the "additional terms" that Cultivatr have suggested are missing and therefore make the contract insufficiently deficient are either present as the defaults of Delaware law provide, or not necessary for a Delaware corporation pursuant to Delaware law.

65. This is especially true, where, as here, there is only one class of stock authorized by Cultivatr.

66. Another way to think about this is: there is no dispute by Cultivatr that JoAnne Artesani owns stock in Cultivatr. That stock is subject to the defaults of Delaware law. So, Nora Peterson was entitled to 5% of Cultivatr's stock, subject to all the same terms and conditions that JoAnne Artesani's 95% ownership was subject to.

67. There has been no suggestion that there is anything wrong with Cultivatr's award of stock to JoAnne Artesani who, while a founder, is a distinct legal person from Cultivatr and who could someday also be terminated by a decision by Cultivatr's Board of Directors.

68. The terms of the oral contract between Cultivatr and Nora Peterson were sufficiently definite. Nora Peterson was entitled to 5% of Cultivatr's issued stock at the time the stock was delivered to her.

69. Defendants have cited repeatedly to the decision of Judge Sanchez in *Sloan v. Frascella*, No 12-3609, 2013 WL 4433366 (E.D. Pa. Aug. 16, 2013). In that case, Judge Sanchez resolved a Rule 50(a) motion in favor of the defendant, finding a promise of 5% equity was not sufficiently definite to be enforceable.

70. This Court has no doubt that Judge Sanchez ruled correctly based on the evidence presented at the trial over which he presided. But, given the nature of opinions on Rule 50(a) motions which occur during trial and must be swiftly adjudicated, there are not nearly enough facts in that written decision from which this Court can determine whether or not the case is actually on all fours with this one. While the rationale for that decision was doubtlessly clear to the parties who litigated the case, this Court cannot tell from its reading of the opinion why there was ambiguity in the offer and acceptance in that case.

71. At any rate, this Court can only analyze the evidence presented to it, and in so analyzing finds no ambiguity in the offer and acceptance here.

72. To the extent this Court's decision is, in fact, in tension with Judge Sanchez's, this Court would respectfully note that the unreported *Sloan* decision is not binding on this Court, and this Court elects not to follow it.

73. Cultivatr and Sproutr have also presented extensive evidence of Nora Peterson's post-acceptance negotiation with them. This Court finds this to largely be a red herring in this case.

74. Having found that there was offer and acceptance of a sufficiently definite contract, a later failed renegotiation does not destroy the existing valid contract.

75. This is best illustrated by way of a hypothetical. Imagine Joe orally agrees to sell his car to his next-door neighbor, Jane. They agree that Joe will give the car to Jane on November 1, and Jane will give Joe $10,000 that same day. A contract has been formed. A few days later, Jane asks Joe "Can I pay you on December 1, instead?" Joe would rather have his money sooner, but knows he has to continue to cooperatively share a driveway with Jane. So, he tries to make something work. He responds to Jane "I can't wait

until December 1, how about November 15?" Jane responds, "I can't do November 15, how about we do December 1, but I make it $11,000 instead?" But Joe needs that money to travel for Thanksgiving, and simply cannot wait that long. They never are able to agree on new payment terms to replace the original terms of $10,000, due on November 1.

76. In that situation, the initial oral contract between Jane and Joe is valid. Joe owes Jane a car on November 1, and Jane owes Joe $10,000 on November 1.

77. So too, here. This Court has found that an oral contract was formed after Nora Peterson spoke with JoAnne Artesani and Nora Peterson accepted that offer. Later attempts to renegotiate, which were not successful, do nothing to upset the original contract.

78. Nora Peterson made clear in her testimony that while she felt she was entitled to the 5% flatly and without any further discussion needed, she participated in negotiations in good faith and was willing to make some sacrifices to keep the peace at her new workplace.

79. That explanation is eminently plausible and entirely credible based on the testimony and supporting evidence.

80. In a different fact pattern, later negotiation may well be evidence that essential terms were not agreed upon. But where, as here, Delaware law explicitly provides gap fillers and defaults for the terms that Defendants claim are missing, the probative value of those negotiations is greatly reduced.

81. Cultivatr might also suggest that the continued negotiations over various terms shows that Cultivatr, by way of JoAnne Artesani, did not subjectively intend to be bound by the oral contract.

82. This Court does not credit the Artesanis' testimony in that respect, and does credit Nora Peterson's testimony in that respect. This Court finds that there was a present intention to be bound by the terms of the oral contract the parties reached.

83. But even if there was a subjective lack of intention, it is the objective manifestations of the parties which control, not the idiosyncratic subjective opinions of the parties. "Under contract law, the objective manifestation of the parties is the governing factor regardless of subjective beliefs and reservations. . . . 'In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter.'" *Rambo v. Greene*, 906 A.2d 1232, 1236 (Pa. Super. 2006) (quoting *Ingrassia Construction Co. v. Walsh,* 486 A.2d 478, 482–83 (Pa. Super. 1984)).

84. At base, this Court concludes that this is a case where JoAnne Artesani, perhaps a bit overeager and bit inexperienced, rushed in and made a firm offer which was giving up more than she appreciated at the time. When a later investment made that offer much more expensive to live up to, she had buyer's remorse and wishes she had included all sorts of bells and whistle that she did not.

85. While that later regret is understandable, it does not change the past. There was offer and acceptance, supported by consideration, and sufficiently definitive terms. There is no relevance here to a later failed attempt to renegotiate.

   **f.  Employment Agreement**

86. Another argument that Cultivatr and Sproutr have made is that Cultivatr stock grant could not have been intended as a contract, because the Parties entered into the offer letter or written employment contract shortly later, and did not include it.

87. Nora Peterson testified that she was told the Cultivatr stock portion would not be listed in her offer letter, so she was not surprised that it was not.

88. As this Court explained, JoAnne Artesani and Nora Peterson formed two contracts by way of their October 2023 discussions. An employment arrangement between Nora Peterson and Sproutr, and a sign-on agreement with Cultivatr.

89. Nora Peterson's contract with Cultivatr was never memorialized in writing.

90. The only written contract presented to the Court was the employment agreement between Sproutr and Nora Peterson. (D-12). This agreement does not purport to be on behalf of Cultivatr, and seems to make no reference to Cultivatr.

91. This contract includes an Attorney's Fees provision which permits an award of fees to a prevailing party if "either party should resort to legal proceedings in connection with the enforcement of this Agreement . . . ." (D-12).

92. Therefore, the employment contract's Entire Agreement provision provides no obstacle to enforcing Cultivatr's separate oral contract. Nor does its non-inclusion raise an inference that the Parties did not intend to be bound by the oral agreement with respect to Cultivatr's stock.

93. The same reasoning applies with equal force to Sproutr's offer letter, signed by JoAnne Artesani in her capacity as CEO of Sproutr. (D-48). Sproutr was in no position to offer, on its own behalf, stock in its parent company.

94. Further, while this agreement purports to be the "entire agreement" between the Parties, a review of its contents makes it obvious that it is only a restrictive covenant. (D-12). It does not address Nora Peterson's job title, job responsibilities, salary, benefits, or anything of that nature. In that sense, it could only be the entire agreement as to confidentiality, non-solicitation, and other restrictive covenants of that nature. No reasonable person could conclude that this written agreement (D-12) actually represents the entire agreement between the parties.

### g. Attorney's Fees

95. Each side has asserted a right to attorney's fees from the other based upon the Sproutr "Employment Agreement."

96. But for the same reasons that the Entire Agreement provisions provide no bar to recovery for Nora Peterson here, both Parties' claims for attorneys' fees also fall short.

97. The Attorneys' Fees provision of the contract only arises "either party should resort to legal proceedings in connection with the enforcement of **this Agreement** . . . ." (D-12) (emphasis added).

98. This Court has found the existence of two agreements: one between Sproutr and Nora Peterson, and the other between Cultivatr and Nora Peterson. The entirety of this litigation has been about the oral agreement between Cultivatr and Nora Peterson, which has no attorneys' fees provision. Therefore, the default American Rule applies and there can be no award of attorneys' fees.

99. During closing arguments, Nora Peterson's counsel was unable to state any basis whatsoever which connected Plaintiff's actual *claim* to the employment agreement which included the attorneys' fees provision.

100. Nora Peterson's counsel rightly observed that the Federal Rule of Civil Procedure 54(d)(2) governs the procedure by which parties make claims for attorneys' fees gives parties until 14 days after the entry of judgment to make a claim for attorneys' fees. This Courts writes now, in the first instance, to put the Parties on notice of its view of attorneys' fees, as substantial evidence and argument regarding fees was presented during trial and in closing arguments. To the extent Plaintiff wishes to make a fee request after entry of judgment to preserve its appellate rights as to the same, she is welcome to do so.

### h. Breach of contract.

101. The Parties agree that Nora Peterson never received the promised 5% equity in Cultivatr to which she was contractually entitled pursuant to the oral agreement. For that reason, this Court finds that Cultivatr breached is contractual obligation to Nora Peterson.

### i. Damages

102. The only remaining task as to Nora Peterson's breach of contract claim is to assess damages.

103. Under both Pennsylvania and Delaware law, specific performance of a contract is disfavored where economic damages would suffice. *See Lineberger v. Welsh,* 290 A.2d 847, 848 (Del. Ch. 1972) ("As to contracts for the sale of corporate stock our courts have uniformly held that where the stocks purchasable in the market, or its value otherwise ascertainable, specific performance is not available, the legal remedy of damages being adequate."); *see also, Estate of Caruso v. Caruso*, 322 A.3d 885 (Pa. 2024) (second alteration in original) ("[S]pecific performance should only be granted where the facts clearly establish the plaintiff's right thereto, where [an] adequate remedy at law does not exist, and where justice requires it.").

104. This Court finds that economic damages will suffice, and will not require specific performance or declare Nora Peterson partial owner of Cultivatr. Nora Peterson can be made whole by way of money damages.

105. This approach will both avoid unnecessary entanglement between hostile parties, avoid overuse of this Court's equitable powers, and will protect Nora Peterson from the likelihood of prompt dilution upon the award of shares, were the Court to equitably award ownership interest.

106. Under Pennsylvania law, "[w]here the amount of damage can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with entire accuracy." *Delahanty v. First Pennsylvania Bank, N.A.,* 464 A.2d 1243, 1258 (Pa. Super. 1983). The same basic standard applies under Delaware law. *See Total Care Physicians, P.A. v. O'Hara,* No. CIV.A. 99C-11-201JRS, 2003 WL 21733023, at *3 (Del. Super. Ct. July 10, 2003) ("The quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage.").

107. Here, this Court will credit John Artesani's contemporaneous management valuation of 5% of Cultivatr at the time Nora Peterson was

16

deprived of her right to 5% of Cultivatr. *See Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *7 (Del. Ch. Dec. 31, 2003) ("When management projections are made in the ordinary course of business, they are generally deemed reliable."), aff'd in relevant part, reversed on other grounds, 884 A.2d 26 (Del. 2005).

108. This amount, according to John Artesani's Teams message, was $963,000. (D-6).

109. Recognizing that this amount was shorthand based upon Nora Peterson's persuasive formulaic explanation of how that number was arrived at, this Court will adjust that number to $963,333.33.

110. Further, this Court finds that Nora Peterson is entitled to 5% of all distributions made by Cultivatr to its shareholders, if any, since December 1, 2023.

111. Therefore, as damages in this case, this Court determines that Cultivatr is liable to Nora Peterson in the amount of $963,333.33 plus 5% of all stockholder distributions from December 1, 2023, to the date of the entry of judgment in this case.

112. This Court has considered Cultivatr's evidence that the $963,000 valuation by John Artesani was erroneous because it was based upon treating the entirety of Accelerant's $3.4 million as capital, not as revenue.

113. But this Court rejects that conclusion. The Court determines, from its assessment of the documentary evidence as well as the credibility of the Artesanis, that the $3.4 million was indeed a capital investment—regardless of how the accountants actually treated it.

114. That conclusion is further supported by the behavior of the Artesanis, who went to great lengths to find an appropriate tax structure for the equity grant specifically because the Accelerant investment suddenly ballooned the value of Cultivatr.

115. If that amount was actually $3 million in revenue and $400,000 in investment, there would be no valuation or tax problems, as Nora

17

Peterson's 5% share of Cultivatr would only have been worth $113,000 in pre-money valuation, which would not have been prohibitively expensive in terms of taxes.

116. The Parties are encouraged to expeditiously engage in discussions determining the amount, if any, of Cultivatr's distributions to date. If the Parties can stipulate as to the value of 5% of that amount, they should file such stipulation on the docket, and this Court will amend its judgment to include that amount or to note that no such distributions have occurred.

117. If the Parties cannot stipulate to an amount owed for previous distributions, they should notify the Court of their intent to undertake discovery support of execution pursuant to Pennsylvania law, as permitted by Federal Rule of Civil Procedure 69(a)(2), after which the Court will establish a scheduling order for this briefing, if needed. At the conclusion of such discovery, this Court will consider a motion to amend the judgment. This Court's order entering judgment in this case will also establish a scheduling order for this purpose.

### j. Promissory Estoppel

118. Finally, this Court writes briefly to note that, were it not to find a breach of contract, it would easily have found in favor of Nora Peterson on her claim for promissory estoppel.

119. The above facts clearly create a promise that Cultivatr and its key executives expected would induce Nora Peterson to join their company. That's the reason they offered it.

120. Nora Peterson then actually acted on it by joining Sproutr and abandoning her successful independent consulting business.

121. For all the reasons explained above, justice can only be served by holding Cultivatr and JoAnne Artesani to their promise.

122. But, because it would not have been reasonable from Nora Peterson to expect that Sproutr would provide stock in its parent's company, Nora Peterson's promissory estoppel claim fails against Sproutr.

### k. Declaratory Judgment

123. Finally, this Court addresses Nora Peterson's request for declaratory relief.

124. Courts routinely deny declaratory relief where it would be duplicative of a claim for breach of contract. *See Kapotas v. CTP Funding, LLC,* No. 2:24-CV-01995, 2025 WL 2250003, at *11 (E.D. Pa. Aug. 6, 2025) (Weilheimer, J.).

125. This Court finds that, based upon the evidence presented at trial, the declaratory relief which could even conceivably be justified would be duplicate of the liability found for breach of contract.

126. For that reason, this Court denies Plaintiff's request for declaratory relief.

An appropriate order will follow.

DATED: November 3, 2025                BY THE COURT:

_____
GAIL WEILHEIMER        J.